## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | |
|---|---|
| CYNTHIA FISHER; ESTHER "FAYE" PAYTON; EDWARD WILLIAMS; MACEDONIA MISSIONARY BAPTIST CHURCH; and ROBERT ZELLNER,<br><br>     *Plaintiffs*,<br><br>v.<br><br>CITY OF OCEAN SPRINGS, MISSISSIPPI,<br><br>     *Defendant*. | Civil Action No.   1:23cv265 TBM-RPM |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Cynthia Fisher, Esther "Faye" Payton, Edward Williams, Macedonia Missionary Baptist Church, and Robert Zellner hereby file this Complaint for Declaratory and Injunctive Relief and sue Defendant City of Ocean Springs, Mississippi, as follows:

### INTRODUCTION

1.    This civil-rights lawsuit seeks to vindicate the due process rights of Plaintiffs Cynthia Fisher, Esther "Faye" Payton, Edward Williams, Macedonia Missionary Baptist Church, and Robert Zellner. Plaintiffs are all longtime members of the local community, which includes the century-old, majority-Black Railroad District, as well as local small businesses that have served residents for decades. On April 4, 2023, Defendant City of Ocean Springs passed a resolution declaring Plaintiffs' (and others') properties to be an "urban renewal area," which requires a factual finding of substantial blight or slum, and which allows for subsequent exercises of eminent domain. The City did so without attempting to provide Plaintiffs with any notice regarding the proposed resolution, its significance, or the short (10-day) window for challenging it. Plaintiffs

1

learned of the resolution months later and, accordingly, never had any notice that their rights were in jeopardy. Had they received adequate notice, they would have timely defended their interests by demonstrating that their neighborhoods are not blight or slum. Without such notice, Plaintiffs never had a meaningful opportunity to be heard.

2.    The deficient process by which the City deprived Plaintiffs of their property rights is the process dictated by Mississippi state law. Mississippi statutes do not require that government provide any notice before including property within an urban renewal area. Moreover, Mississippi law provides a mere 10-day window for challenging any municipal decision, including the creation of an urban renewal area. Indeed, after the 10-day window expires, owners may not challenge the legality of the urban renewal area—even as a defense to a subsequent action of eminent domain predicated on the urban renewal area. These statutes, both on their face and as applied to Plaintiffs, deprive Plaintiffs of their property interests without notice and a meaningful opportunity to be heard, in violation of the Due Process component of the Fourteenth Amendment to the United States Constitution.

## PARTIES

1.    Plaintiff Cynthia Fisher is a United States citizen and a resident of the State of Mississippi. Cynthia owns the parcel located at 1303 Robinson Street, Ocean Springs, MS 39564.

2.    Plaintiff Esther "Faye" Payton is a United States citizen and a resident of the State of Mississippi. Faye owns the parcel located at 924 Cash Alley, Ocean Springs, MS 39564.

3.    Plaintiff Edward Williams is a United States citizen and a resident of the State of Mississippi. Edward owns the parcel located at 819 General Pershing Avenue, Ocean Springs, MS 39564.

4.    Plaintiff Macedonia Missionary Baptist Church is a non-profit corporation organized under Chapter 11 of the Corporations, Associations, and Partnerships Laws of the state

of Mississippi. The Church owns the parcel located at 1702 Rev. Dr. Jesse L. Trotter Street, Ocean Springs, Mississippi, where it holds regular services in its sanctuary. It also owns multiple other parcels in Ocean Springs, including two parcels on Martin Luther King Jr. Street, which serve as parking lots for the Church.

5.    Plaintiff Robert Zellner is a United States citizen and a resident of the State of Mississippi. Robert owns the parcels located at 10 and 14 Franklin Road, Ocean Springs, MS 39564.

6.    Defendant City of Ocean Springs ("the City") is a municipal corporation located in Jackson County, Mississippi.

## JURISDICTION AND VENUE

7.    Plaintiffs bring this civil rights lawsuit pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, for violations of rights, privileges, or immunities secured by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

8.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9.    Venue is appropriate in this Court under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## FACTUAL ALLEGATIONS

### *Urban Renewal in the State of Mississippi—Urban Renewal Areas*

10.    Under Mississippi law, municipalities may acquire private property as part of an "urban renewal plan." Miss. Code § 43-35-3(*l*).

11.    Before a municipality may approve an urban renewal plan, however, it must first pass a resolution creating an "urban renewal area" within which the plan would operate. Miss. Code § 43-35-11. This requires making the factual finding that the area is predominated by slum or blight. *Id*. § 43-35-3 (defining "[u]rban renewal area," "[s]lum area," and "[b]lighted area").

12.     Affected property owners may challenge that finding by filing a notice of appeal to state court—but they only have ten days from the resolution's passage to do so. Miss. Code § 11-51-75. That requires, amongst other things, filing "[a] written description or designation of record which includes all matters that the [property owner] desires to be made part of the record." *Id*. § 11-51-75(a)(iii).

13.     Notwithstanding this short timeframe, Mississippi law does not require that municipalities attempt to provide affected property owners with any notice of an upcoming hearing in which the creation or modification of an urban renewal area is being considered.

14.     Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice regarding the significance of an upcoming hearing at which the creation or modification of an urban renewal area is being considered (*i.e.*, that an urban-renewal-area designation is synonymous with a finding of substantial blight or slum; that owners are in danger of losing property interests; etc.).

15.     Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice explaining how they may defend these property interests at an upcoming hearing in which the creation or modification of an urban renewal area is being considered.

16.     Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice explaining how, in the event that an upcoming hearing results in the creation or modification of an urban renewal area, owners may appeal that decision.

17.     Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice explaining that an urban renewal area has been created or modified.

18.    Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice explaining the significance of a newly created or modified urban renewal area (*i.e.*, that an urban-renewal-area designation is synonymous with a finding of substantial blight or slum; that owners are in danger of losing property interests; etc.).

19.    Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice explaining that the window to file a notice of appeal regarding the creation or modification of an urban renewal area is only ten days.

20.    A challenge to an underlying designation of an area as slum or blight is often an effective defense against eminent domain.

21.    But after the 10-day window to appeal, property owners may not challenge the basis for the urban renewal area (*i.e.*, factual findings of substantial blight or slum)—even as a defense to a subsequent exercise of eminent domain premised on the urban-renewal-area designation. *Wiggins v. City of Clinton*, 298 So. 3d 962, 964–65 (Miss. 2020).

22.    Mississippi law does not impose any expiration date on urban-renewal-area designations.

23.    Therefore, many property owners in Mississippi learn that their land has been designated blight or slum long after the (extremely short) period to challenge the designation passes.

24.    Therefore, many Mississippians are denied notice that their property interests are in jeopardy.

25.    Therefore, many Mississippians are not afforded a meaningful opportunity to defend their property interests.

### *Urban Renewal in the State of Mississippi—Urban Renewal Plans*

26.    After creating an urban renewal area, a municipality may approve an urban renewal plan for the area. Miss. Code § 43-35-3(*l*).

27.    The proposed urban renewal plan must "be sufficiently complete to indicate" how the municipality intends on acting upon properties in the area. Miss. Code § 43-35-3(*l*). *See also* Re: Urban Renewal, Op. No. 2001-0750 (Miss. A.G., Dec. 14, 2001) ("[A]n urban renewal plan must be fairly detailed regarding land acquisition, redevelopment and rehabilitations to be completed in the urban renewal area.").

28.    A municipality may approve an urban renewal plan if it finds that certain factors are met—such as the feasibility of relocating displaced families without undue hardship; the conformance of the proposed plan to the municipality's general plan; and the opportunity for private rehabilitation or redevelopment. Miss. Code § 43-35-13(d).

29.    If the municipality approves an urban renewal plan, affected property owners have only ten days from the date of the approval to file a notice of appeal in state court. Miss. Code § 11-51-75. That requires, amongst other things, filing "[a] written description or designation of record which includes all matters that the [property owner] desires to be made part of the record." *Id*. § 11-51-75(a)(iii).

30.    Here, however, municipalities must provide some notice. Before a municipality may approve an urban renewal plan, it must "hold a public hearing on [it], after public notice thereof by publication in a newspaper having a general circulation in the area of operation of the municipality." Miss. Code § 43-35-13(c).

31.    "The notice shall describe the time, date, place and purpose of the hearing, shall generally identify the urban renewal area covered by the plan, and shall outline the general scope of the urban renewal project under consideration." Miss. Code § 43-35-13(c).

32.    There is no requirement that municipalities attempt to provide any individualized notice to affected property owners of an upcoming hearing to approve an urban renewal plan (*e.g.*, by mail or telephone).

33.    Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice explaining how, if an urban renewal plan is approved at an upcoming hearing, they may appeal that decision.

34.    Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice explaining that the window to file a notice of appeal regarding an approval of an urban renewal plan is only ten days.

35.    Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice explaining that an urban renewal plan has been approved.

36.    Likewise, there is no requirement that municipalities attempt to provide affected property owners with any notice explaining the significance of an urban renewal plan's recent approval (*i.e.*, that owners are in danger of losing property interests).

37.    "An urban renewal plan may be modified at any time," and there is no requirement that municipalities provide affected property owners with any notice of any kind regarding the proposed modification, its significance, or how to challenge it. Miss. Code § 43-35-13(e).

38.    In any case, an urban renewal plan is limited to operating within an urban renewal area.

39.    An urban renewal plan's modification does not affect the boundaries of an urban renewal area.

40.    Mississippi law does not impose any expiration date on urban renewal plans.

41.    After the 10-day window to appeal expires, Mississippi does not allow property owners to challenge the legal basis for an urban renewal plan—even as a defense to an exercise of eminent domain predicated on the urban renewal plan. *Wiggins v. City of Clinton*, 298 So. 3d 962, 964–65 (Miss. 2020).

42.    Therefore, many property owners in Mississippi learn that their land has been slated for acquisition as part of an urban renewal plan long after the (extremely short) period to challenge the plan passes.

43.    Therefore, many Mississippians are denied notice that would allow them a meaningful opportunity to defend their property interests.

44.    Therefore, many Mississippians are not afforded a meaningful opportunity to defend their property interests.

### *Ocean Springs Baselessly Designates Six Areas as Blight or Slum*

45.    On April 4, 2023, the Board of Aldermen for the City of Ocean Springs held a public hearing to discuss, amongst other things, passing a resolution that would declare six areas of the City to be urban renewal areas (*i.e.*, to be predominantly slum or blight).

46.    The April 4 resolution was entitled "A RESOLUTION DESIGNATING SLUM AND BLIGHTED AREAS FOR REHABILITATION, CONSERVATION, AND REDEVELOPMENT."

47.    The week before the April 4 hearing, the City published an agenda on its website that stated "Adopt a Resolution approving the Urban Renewal Map."

48.    The agenda did not include a list of properties that would be affected.

49.    The agenda did not include an explanation of the significance of the upcoming proposed resolution (*i.e.*, that owners are in danger of losing important property interests).

50.    The agenda did not include an explanation of how to challenge the proposed resolution, should it pass.

51.    It is unclear whether the agenda included maps relating to a proposed urban renewal area.

52.    The week before the April 4 hearing, the City posted proposed Urban Renewal Maps within Ocean Springs City Hall. These maps did not include a list of properties that would be affected.

53.    Aside from the agenda on its website and the maps in its City Hall, the City published no notice of the upcoming April 4 hearing.

54.    In fact, at least one City alderman stated at the April 4 hearing that he himself did not see the proposed maps until only a few days beforehand.

55.    The City did not attempt to provide affected property owners with any individualized notice of the upcoming April 4 hearing.

56.    The City did not attempt to provide affected property owners with any notice explaining the significance of the upcoming April 4 hearing (*i.e.*, that the City was considering declaring their properties to be within blight or slum areas; that owners are in danger of losing important property interests; etc.).

57.    The City did not attempt to explain to affected property owners how they may defend their property interests at the upcoming April 4 hearing.

58.    The City did not attempt to explain to affected property owners that, should an urban renewal area be created at the upcoming hearing, they would have only ten days to file a notice of appeal challenging it.

59.     At the April 4 hearing, the City passed a resolution declaring six mapped areas ("Areas 1–6") to be urban renewal areas, "inasmuch as there is substantial evidence of the existence of slum and blighted areas within those tracts that merit rehabilitation, conservation and redevelopment, or a combination thereof, which is necessary and in the interests of the public safety, morals and welfare of the residents of our City."

60.     By "substantial evidence of the existence of slum and blighted areas within those tracts" the April 4 resolution was referring, solely, to "letters [that were] received from Wade Morgan, City Planner for the City of Ocean Springs, Mississippi, Allan Ladnier, Director of Public Works, and Darrell Stringfellow, Building Official with the Building Department, said letters being attached [to the resolution] as Exhibit 'B'."

61.     There was, in fact, only one letter attached to the resolution—from Wade Morgan, dated April 4, 2023.

62.     Diagonally across that letter was a watermark stating "DRAFT."

63.     That letter was entirely conclusory. It did not discuss any specific piece of property, nor did it provide any list of properties. All Mr. Morgan stated was that he drove around the areas and that they meet the standard for slum and blight. The letter did not discuss any specific conditions that are supposedly slum or blighted.

64.     More than two weeks after receiving a public records request, the City on October 3, 2023, produced undated letters from Allan Ladnier and Darrell Stringfellow.

65.     Mr. Ladnier's letter does not mention blight or slum but, instead, states only that "[t]he parcels depicted in the proposed City of Ocean Springs Urban Renewal Map are in need of the renewal plan and redevelopment."

66.     Mr. Ladnier's letter does not include a list of properties.

67.    Mr. Ladnier's letter does not discuss any specific property or any conditions that are supposedly slum or blighted.

68.    Mr. Ladnier's letter references "the renewal plan," yet no urban renewal plan had been proposed as of April 4, 2023.

69.    Mr. Stringfellow's letter does not mention blight or slum but, instead, states only that "[m]any of the parcels depicted in the proposed City of Ocean Springs Urban Renewal Map are in need of a renewal plan and redevelopment."

70.    Mr. Stringfellow's letter does not include a list of properties.

71.    Mr. Stringfellow's letter does not discuss any specific property or any conditions that are supposedly slum or blighted.

72.    These areas do not contain substantial slum or blight. For example, the *sole parcel* in Area 6 contains the City's own City Hall and Library, which are pristine:



(Ocean Springs City Hall, located on the sole parcel in Area 6)

73.    Area 4 is the center of Ocean Springs's historically Black community. Like every other Area identified by the City, Area 4 is not substantially blighted or slum:



(A private parcel in Area 4)

74.    The vote in favor of the April 4 resolution was not unanimous (five aldermen voted for it; two voted against).

75.    At the hearing, the two aldermen who voted against the April 4 resolution explained their reasoning: These areas contain many properties that are not blighted or slum.

76.    In response, other City officials stated, incorrectly, that an urban-renewal-area designation does not require a finding of blight or slum but, instead, might merely identify an area with "potential for redevelopment." This is despite the fact that the April 4 resolution was entitled

"A RESOLUTION DESIGNATING SLUM AND BLIGHTED AREAS FOR REHABILITATION, CONSERVATION, AND REDEVELOPMENT."

77.     Moreover, City officials suggested that the City should pass the resolution first, then later modify it.

78.     Had affected property owners been afforded proper notice, they would have explained that the aldermen voting against the April 4 resolution were correct.

79.     It is plausible that, in that case, other aldermen would have been persuaded to vote against the April 4 resolution and that it would not have passed.

80.     But affected property owners were not afforded proper notice and, accordingly, they were unable to defend their interests at the April 4 hearing.

81.     Following the April 4 hearing, the City did not attempt to provide affected property owners with any individualized notice informing them that the City had created an urban renewal area.

82.     Following the April 4 hearing, the City did not attempt to provide affected property owners with any individualized notice informing them of the significance of the urban renewal areas it had created (*i.e.*, that they are synonymous with a declaration of substantial slum or blight; that owners are in danger of losing important property interests; etc.).

83.     Following the April 4 hearing, the City did not attempt to explain to affected property owners how they may file a notice of appeal challenging the decision to create urban renewal areas.

84.     Following the April 4 hearing, the City did not attempt to explain to affected property owners that they had a mere 10-day window to file a notice of appeal challenging the decision to create urban renewal areas.

85.     The City did not publish, and still has not published, any list of properties included within the urban renewal areas created pursuant to the April 4 resolution.

### *Ocean Springs Proposes a Half-Baked Urban Renewal Plan*

86.     On August 21, 2023, the City revealed a proposed urban renewal plan ("the Plan") for the areas designated on April 4. The Board of Aldermen then passed a resolution to hold a public hearing on the Plan, with newspaper publication pursuant to Mississippi statute.

87.     The Plan provides scant details on what the City intends to do with properties in the Areas. For example, many listed properties state only "possible acquisition by the City for future development."

88.     The City scheduled a hearing regarding the Plan for October 2 and published notice of the hearing in the Sun Herald, a newspaper with local circulation.

89.     The published notice did not explain how affected property owners may challenge the Plan, should it be approved.

90.     The published notice did not explain that affected property owners would have only ten days following the Plan's approval to challenge it in state court.

91.     The City did not attempt to provide affected property owners with any individualized notice relating to the October 2 hearing.

92.     At the October 2 hearing, the City (through City Attorney Robert Wilkinson) suggested, for the first time, that residents (but not businessowners) could sign a form that would opt them out of the Plan (but not the blight or slum designation). But, according to City Attorney Wilkinson, "the downside to that is you will then no longer be eligible for any [federal or state] grants that may come down the pipe."

93.     There is no statutory basis for opting out of an urban renewal plan.

94.     There is no mention in the Plan of a method of opting out.

95.    Even if an owner could opt out of the Plan, that would not opt the owner out of the underlying urban-renewal-area designation, which declares the area predominated by slum or blight and which allows future exercises of eminent domain.

96.    Many residents testified at the October 2 hearing that they were blindsided by the City's actions and that their neighborhoods are not blight or slum.

97.    Suranjan Sen, one of the undersigned attorneys at the Institute for Justice, testified at the October 2 hearing that the City has not followed statutory and constitutional obligations. Moreover, he submitted to the City an expert report by Dave Phillips, an architect with decades of experience conducting blight analysis, detailing inadequacies of the April 4 blight and slum designation (as well as the Plan).

98.    The City adjourned the October 2 hearing without voting on whether to approve the Plan.

99.    Nevertheless, following the October 2 hearing's conclusion, the City Mayor stated: "We're not going to stop the plan."

## PARTIES

### *Cynthia Fisher*

100.    Plaintiff Cynthia Fisher owns a single-family home located at 1303 Robinson Street in Ocean Springs, Mississippi.

101.    Below is a recent photograph of 1303 Robinson Street:



102.    1303 Robinson Street lies in the Railroad District, a historically Black neighborhood situated just south of both Highway 90 and the railroad tracks that run east to west across central Ocean Springs.

103.    The home at 1303 Robinson Street is more than one hundred years old, and it has housed six generations of Cynthia's family members. Cynthia's grandmother originally purchased the property, which was passed down to Cynthia's mother and, eventually, to Cynthia and her siblings.

104.    Accordingly, Cynthia and her family have no desire to sell 1303 Robinson Street.

105.    Although Cynthia owns 1303 Robinson Street, her sister now lives there. Cynthia resides at 914 Blount Street, which is a two-minute walk from her ancestral home.

106.    1303 Robinson Street lies in Ocean Springs Urban Renewal Area 4.

107.    1303 Robinson Street is mentioned explicitly in the Plan, which describes 1303 Robinson Street as—in the City's words—"well maintained."

108.    On the same page, the Plan states that the City will "require the owner [of 1303 Robinson Street] to minimize blighting influences." There is no explanation as to what "blighting influences" means, or how Cynthia could possibly "minimize blighting influences" on what is admittedly "well maintained" property.

109.    Cynthia did not learn that the City had placed her property within an urban renewal area—*i.e.*, that it declared her property to be within a blight or slum zone—until August 2023.

110.    Had Cynthia received adequate notice of the proposed urban-renewal-area designation, she would have presented evidence at the April 4 hearing. If the resolution still passed, she would have filed a challenge within the 10-day window.

111.    Cynthia wishes to contest the factual and legal basis for her property's inclusion within an urban renewal area.

112.    Cynthia is able and willing to demonstrate that neither 1303 Robinson Street nor the area as a whole is located within a blight or slum area.

113.    But the 10-day window for Cynthia to challenge the basis for the urban renewal area closed on April 14—months before Cynthia ever learned about it.

114.    Ordinary property owners like Cynthia need at absolute minimum several weeks' notice, and an explanation of filing deadlines and their significance, before they may be expected to gather and present a meaningful case in opposition to an urban-renewal-area designation.

115.    Therefore, even if Cynthia had learned about the proposed Urban Renewal Area when the City posted its agenda for April 4, there would not have been enough time for Cynthia to hire an attorney and expert to oppose the resolution.

116.    Nevertheless, Cynthia still would have appeared and objected to the April 4 resolution had she received notice and an opportunity to be heard, even if she were unable to hire an attorney and expert to assist her in doing so.

117.    Even without an attorney and expert to assist her, Cynthia would have been able to explain that neither her property nor the area in which it is located contains substantial blight or slum.

118.    So long as Cynthia's property remains within an urban renewal area, the City may approve a plan authorizing its acquisition in relation to (nonexistent) blight and slum.

119.    Even if the City passes a plan that omits Cynthia's property, it can later modify that plan "at any time" to include her property. And it can do so without giving Cynthia notice. Miss. Code § 43-35-13(e).

120.    Should the City ever initiate eminent domain proceedings against 1303 Robinson Street, Cynthia would be barred from challenging the underlying blight or slum designation as a defense to the taking.

### Esther "Faye" Payton

121.    Plaintiff Esther "Faye" Payton owns a single-family home at 924 Cash Alley in the Railroad District of Ocean Springs, Mississippi.

122.    Below is a recent photograph of 924 Cash Alley:



123.    Faye's grandparents—Herbert Thurmon, Sr., and Merlissis Brown-Thurmon—built the home brick-by-brick in the 1940s. Each day, Merlissis rode her bicycle to and from her job in the laundry room of Keesler Army Airfield. On paydays, she would bicycle to a shop on her way home from work to purchase bricks that she and her husband fashioned into a home.

124.    Faye's mother was one of 12 children, and Faye is one of 59 of Herbert's and Merlissis's grandchildren. A member of Faye's family has occupied 924 Cash Alley since it was completed, and Faye and her siblings grew up there. Her godparents lived across the street, and other family members occupied nearby houses. Despite several hurricanes and rapid development

in the surrounding neighborhoods of Ocean Springs, 924 Cash Alley has remained a treasured place of familial refuge for six generations of Faye's family members.

125.    Accordingly, Faye and her family have no desire to sell 924 Cash Alley.

126.    Every other year, Faye's extended family comes together for a reunion in Ocean Springs. During these reunions, hundreds of her relatives gather to celebrate their shared heritage in the town where Faye's grandparents built their home. Faye plans to host the 2024 reunion at 924 Cash Alley.

127.    Faye's cousin currently lives at 924 Cash Alley.

128.    924 Cash Alley is within Area 4 of the Ocean Springs Urban Renewal Area.

129.    924 Cash Alley is not mentioned explicitly within the Plan, though its inclusion within Area 4 means that it can be acquired by the City as part of a future urban renewal plan.

130.    Faye did not learn that the City had placed her property within an urban renewal area—*i.e.*, that it declared her property to be within a blight or slum zone—until August 2023.

131.    Had Faye received adequate notice of the proposed urban-renewal-area designation, she would have presented evidence at the April 4 hearing. If the resolution still passed, she would have filed a challenge within the 10-day window.

132.    Faye wishes to contest the factual and legal basis for her property's inclusion within an urban renewal area.

133.    Faye is able and willing to demonstrate that neither 924 Cash Alley nor the area as a whole is located within a blight or slum area.

134.    But the 10-day window for Faye to challenge the basis for the urban renewal area closed on April 14—months before Faye ever learned about it.

135. Ordinary property owners like Faye need at absolute minimum several weeks' notice, and an explanation of filing deadlines and their significance, before they may be expected to gather and present a meaningful case in opposition to an urban-renewal-area designation.

136. Therefore, even if Faye had learned about the proposed Urban Renewal Area when the City posted its agenda for April 4, there would not have been enough time for Faye to hire an attorney and expert to oppose the resolution.

137. Nevertheless, Faye still would have appeared and objected to the April 4 resolution had she received notice and an opportunity to be heard, even if she were unable to hire an attorney and expert to assist her in doing so.

138. Even without an attorney and expert to assist her, Faye would have been able to explain that neither her property nor the area in which it is located contains substantial blight or slum.

139. So long as Faye's property remains within an urban renewal area, the City may approve a plan authorizing its acquisition in relation to (nonexistent) blight and slum.

140. Even if the City passes a plan that does not include Faye's property, the property's inclusion in an urban renewal area means that the City can later modify that plan "at any time" to include Faye's property. And it can do so without giving Faye notice. Miss. Code § 43-35-13(e).

141. Should the City ever initiate eminent domain proceedings against 924 Cash Alley, Faye would be barred from challenging the underlying blight or slum designation as a defense to the taking.

### *Edward Williams*

142. Plaintiff Edward Williams owns a single-family home at 819 General Pershing Avenue in the Railroad District of Ocean Springs, Mississippi.

143.    Below is a recent photograph of 819 General Pershing Avenue:



144.    Edward, a combat veteran, was born in the Railroad District in the 1940s. After graduating from a segregated high school, Edward served in the Army for 25 years. Once he retired from the armed forces, he began a second career working for the Veterans Administration. Edward is now retired from public service.

145.    Edward purchased 819 General Pershing Avenue in 1976. There, he and his wife raised their children in the same neighborhood where Edward grew up.

146.    Although his wife has since passed away, Edward still lives in the home. Moreover, Edward has close relationships with his longtime neighbors.

147.    Accordingly, Edward has no desire to sell 819 General Pershing Avenue.

148.    819 General Pershing Avenue is within Area 4 of the Ocean Springs Urban Renewal Area.

149.    819 General Pershing Avenue is not mentioned explicitly within the Plan, though its inclusion within Area 4 means that it can be acquired by the City as part of a future urban renewal plan.

150.    Edward did not learn that the City had placed his property within an urban renewal area—*i.e.*, that it declared his property to be within a blight or slum zone—until August 2023.

151.    Had Edward received adequate notice of the proposed urban-renewal-area designation, he would have presented evidence at the April 4 hearing. If the resolution still passed, he would have filed a challenge within the 10-day window.

152.    Edward wishes to contest the factual and legal basis for his property's inclusion within an urban renewal area.

153.    Edward is able and willing to demonstrate that neither 819 General Pershing Avenue nor the area as a whole is located within a blight or slum area.

154.    But the 10-day window for Edward to challenge the basis for the urban renewal area closed on April 14—months before Edward ever learned about it.

155.    Ordinary property owners like Edward need at absolute minimum several weeks' notice, and an explanation of filing deadlines and their significance, before they may be expected to gather and present a meaningful case in opposition to an urban-renewal-area designation.

156.    Therefore, even if Edward had learned about the proposed Urban Renewal Area when the City posted its agenda for April 4, there would not have been enough time for Edward to hire an attorney and expert to oppose the resolution.

157.    Nevertheless, Edward still would have appeared and objected to the April 4 resolution had he received notice and an opportunity to be heard, even if he were unable to hire an attorney and expert to assist him in doing so.

158.    Even without an attorney and expert to assist him, Edward would have been able to explain that neither his property nor the area in which it is located contains substantial blight or slum.

159.    So long as Edward's property remains within an urban renewal area, the City may approve a plan authorizing its acquisition in relation to (nonexistent) blight and slum.

160.    Even if the City passes a plan that does not include Edward's property, the property's inclusion in an urban renewal area means that the City can later modify that plan "at any time" to include Edward's property. And it can do so without giving Edward notice. Miss. Code § 43-35-13(e).

161.    Should the City ever initiate eminent domain proceedings against 819 General Pershing Avenue, Edward would be barred from challenging the underlying blight or slum designation as a defense to the taking.

### *Macedonia Missionary Baptist Church*

162.    Plaintiff Macedonia Missionary Baptist Church, Inc. is a non-profit corporation organized under Chapter 11 of the Corporations, Associations, and Partnerships Laws of the state of Mississippi. The Church owns the parcel located at 1702 Dr. Rev. Jesse L. Trotter Street, Ocean Springs, Mississippi, where it holds regular services for its 300-member congregation.

163.    The Church has been a pillar of the Ocean Springs community for more than 130 years. The Church was organized in 1891, and its congregation originally met in a building it rented on the east side of Taylor Street.

164.    Under the leadership of Reverend T.S. Edwards, the Church completed construction of a permanent sanctuary on Weed Street in 1914. In the years that followed, the congregation worked diligently to pay off the mortgage on their land.

165.    In 1962, Reverend Dr. Jesse Lee Trotter, Sr., became the Church's leader. He served in this capacity for 42 years and, in 1981, became Ocean Springs's first Black alderman. During Reverend Dr. Trotter's tenure, the Church constructed a new sanctuary on its Weed Street lot in 1999.

166.    In 2011, Ocean Springs renamed Weed Street to Rev. Dr. Jesse L. Trotter Street.

167.    As the Church's congregation grew, so too did its need for additional space near the Church. To ensure that the Church would have space to grow, Ocean Springs residents donated several additional parcels to the Church in the early 1970s.

168.    Presently, the Church owns five parcels that appear within Area 4 of the Ocean Springs Renewal Area. Four of these parcels are mentioned explicitly in the Plan; one is not.

169.    One Church parcel mentioned in the Plan, Parcel ID 60119320.000, is located at the intersection of Martin Luther King, Jr. Avenue and Railroad Street. It serves as a parking lot for the church's congregation.

170.    Below is a recent photograph of that parcel:



(Parcel ID 60119320.000. The Church can be seen in the background.)

171.    According to the Plan, the City's planned treatment for that parcel is that "[t]he City will monitor the property for compliance with property maintenance and appearance codes and require the owner to minimize blighting influences."

172.    There is no explanation as to what "minimize blighting influences" means.

173.    The Plan further indicates that the City would like to acquire that parcel for "[f]uture development for medical, commercial and/or mixed uses consistent with the comprehensive plan."

174.    Another Church parcel mentioned in the Plan, Parcel ID 60119310.000, is located near the Church on Railroad Street. The Church hosts fundraisers and cookouts on this parcel.

175.    Below is a recent photograph of that property:



176.    According to the Plan, the City's planned treatment of that parcel is "[p]roperty maintenance and code compliance."

177.    Otherwise, the Plan indicates that the City would like to acquire that parcel for "[f]uture redevelopment or add to housing stock."

178.    A third Church parcel mentioned in the Plan, Parcel ID 60119404.000 (incorrectly labeled as Parcel ID 61119404.000), is a vacant, wooded lot north of the Fallo-Pleasant Municipal Parking Lot.

179.    According to the Plan, the City's planned treatment of that parcel is "[m]onitor for property maintenance."

180.    Otherwise, the Plan indicates that the City would like to acquire that parcel for "[r]edevelopment in conjunction with other parcels for parking lot, commercial and residential uses."

181.    The last Church parcel mentioned in the Plan, Parcel ID 60119406.000 (incorrectly labeled as Parcel ID 61119406.000), is another vacant, wooded lot north of the Fallo-Pleasant Municipal Parking Lot.

182.    According to the Plan, the City's planned treatment of that parcel is "[m]onitor for property maintenance."

183.    Otherwise, the Plan indicates that the City would like to acquire that parcel for "[r]edevelopment in conjunction with other parcels for parking lot, commercial and residential uses."

184.    The Church owns one other parcel that is within Area 4 and therefore subject to a blight or slum designation and possible future eminent domain action, but that is not mentioned in the Plan.

185.    That parcel, Parcel ID 60119326.000, is located across Martin Luther King, Jr. Avenue from the Church. The Church utilizes this parcel as a parking lot for its congregation.

186.    Below is a recent photograph of that property:



187.    The Church does not want to sell any of its properties.

188.    The Church did not learn that the City had placed its properties within an urban renewal area—*i.e.*, that it declared the Church's properties to be within a blight or slum zone—until August 2023.

189.    Had the Church received adequate notice of the proposed urban-renewal-area designation, it would have presented evidence at the April 4 hearing. If the resolution still passed, it would have filed a challenge within the 10-day window.

190.    The Church wishes to contest the factual and legal basis for its properties' inclusion within an urban renewal area.

191.    The Church is able and willing to demonstrate that neither its properties nor the area as a whole is located within a blight or slum area.

192.    But the 10-day window for the Church to challenge the basis for the urban renewal area closed on April 14—months before the Church ever learned about it.

193.    Ordinary property owners like the Church need at absolute minimum several weeks' notice, and an explanation of filing deadlines and their significance, before they may be expected to gather and present a meaningful case in opposition to an urban-renewal-area designation.

194.    Therefore, even if the Church had learned about the proposed Urban Renewal Area when the City posted its agenda for April 4, there would not have been enough time for the Church to hire an attorney and expert to oppose the resolution.

195.    Nevertheless, the Church still would have appeared and objected to the April 4 resolution had it received notice and an opportunity to be heard, even if it was unable to hire an attorney and expert to assist it in doing so.

196.    Even without an attorney and expert to assist it, the Church would have been able to explain that neither its property nor the area in which it is located contains substantial blight or slum.

197.    So long as the Church's properties remain within an urban renewal area, the City may approve a plan authorizing its acquisition in relation to (nonexistent) blight and slum.

198.    Even if the City passes a plan that omits the Church's property, it can later modify that plan "at any time" to include its property. And it can do so without giving the Church notice. Miss. Code § 43-35-13(e).

199.    Should the City ever initiate eminent domain proceedings against the Church's properties, the Church would be barred from challenging the underlying blight or slum designation as a defense to the taking.

### *Robert Zellner*

200.    Plaintiff Robert Zellner owns two parcels of commercial land located at 10 and 14 Franklin Road, Ocean Springs, Mississippi.

201.    10 Franklin Road has two buildings. One is for Robert's business, Zellners Import Auto Inc. The second is for a business called Gulf Coast Motorsports, which rents its space from Robert.

202.    Below is a recent photograph of 10 Franklin Road:



203.    14 Franklin Road has one building, which is home to MacGyver's Small Engine, Equipment, and Tool Repair. This business, too, rents its space from Robert.

204.    Below is a recent photograph of 14 Franklin Road:



205.    Robert has lived in Ocean Springs for most of his adult life. He taught community college for a decade, before founding Zellners Import Auto Inc. with his father in 1982. From their location on 10 Franklin Road, Robert and his father would perform repairs and maintenance on Volvo-brand automobiles.

206.    Robert's father has since passed away, and Robert now runs his business himself (with assistance from one employee).

207.    Robert would like to run his business for at least a few more years, then he would like to support himself in retirement with rental income from 10 and 14 Franklin Road.

208.    Accordingly, Robert is not interested in selling 10 or 14 Franklin Road.

209.    10 and 14 Franklin Road (and the buildings situated on them) lie in Ocean Springs Urban Renewal Area 2.

210.    Robert did not learn that the City had placed his property within an urban renewal area—*i.e.*, that it declared his property to be within a blight or slum zone—until August 2023.

211.    Had Robert received adequate notice of the proposed urban-renewal-area designation, he would have presented evidence at the April 4 hearing. If the resolution still passed, he would have filed a challenge within the 10-day window.

212.    Robert wishes to contest the factual and legal basis for his properties' inclusion within an urban renewal area.

213.    Robert is able and willing to demonstrate that neither his properties nor the area as a whole is located within a blight or slum area.

214.    But the 10-day window for Robert to challenge the basis for the urban renewal area closed on April 14—months before Robert ever learned about it.

215.    Ordinary property owners like Robert need at absolute minimum several weeks' notice, and an explanation of filing deadlines and their significance, before they may be expected to gather and present a meaningful case in opposition to an urban-renewal-area designation.

216.    Therefore, even if Robert had learned about the proposed Urban Renewal Area when the City posted its agenda for April 4, there would not have been enough time for Robert to hire an attorney and expert to oppose the resolution.

217.    Nevertheless, Robert still would have appeared and objected to the April 4 resolution had he received notice and an opportunity to be heard, even if he were unable to hire an attorney and expert to assist him in doing so.

218.    Even without an attorney and expert to assist him, Robert would have been able to explain that neither his property nor the area in which it is located contains substantial blight or slum.

219.    So long as Robert's property remains within an urban renewal area, the City may approve a plan authorizing its acquisition in relation to (nonexistent) blight and slum.

220.    10 and 14 Franklin Road are explicitly mentioned within the City's Plan for "[p]ossible acquisition by the City for future development."

221.    The Plan does not mention any blight or slum influence relating to 10 or 14 Franklin Road, or the general area in which it is located.

222.    Even if the City passes a plan that omits Robert's property, it can later modify that plan "at any time" to include his property. And it can do so without giving Robert notice. Miss. Code § 43-35-13(e).

223.    Should the City ever initiate eminent domain proceedings against 10 or 14 Franklin Road, Robert would be barred from challenging the underlying blight or slum designation as a defense to the taking.

**INJURY TO PLAINTIFFS**

224.    Plaintiffs have a constitutionally protected property interest in Mississippi's statutory cause of action to challenge urban-renewal-area designations affecting their property.

225.    Moreover, Plaintiffs have a constitutionally protected property interest in challenging a blight or slum designation that purports to establish the constitutional predicate for public use allowing a future exercise of eminent domain.

226.    Moreover, Plaintiffs have a constitutionally protected property interest in challenging a blight or slum designation that could allow acquisition and transfer of their land to a private developer, which otherwise would be barred by Article 3, Section 17A of the Mississippi Constitution.

227.    Under Mississippi law, these property interests extinguish just ten days after the passage of a resolution creating an urban renewal area.

228.    Because that time period has passed, Plaintiffs have lost those statutory and constitutional rights.

229.    Ocean Springs deprived Plaintiffs of their property rights without notice and a meaningful opportunity to be heard.

230.    On April 4, the City passed a resolution that created six urban renewal areas affecting properties owned by Plaintiffs.

231.    Relying on Mississippi statutory law, the City did not attempt to provide property owners with any individualized notice prior to the April 4 hearing.

232.    Relying on Mississippi statutory law, the City did not attempt to provide property owners with an explanation of the significance of the proposed April 4 resolution (*i.e.*, of the property interests they were in danger of losing) prior to the hearing.

233.    Relying on Mississippi statutory law, the City did not attempt to provide affected property owners with an explanation as to how they may challenge the proposed April 4 resolution, either at the April 4 hearing or by filing a notice of appeal afterward.

234.    Relying on Mississippi statutory law, the City did not attempt to explain to affected property owners that, should the April 4 resolution pass, they would have only ten days to file a notice of appeal challenging it.

235.    The only notice of any kind the City attempted to provide people of the April 4 hearing was the publication of an agenda on its website less than one week prior to April 4, as well as a display of maps within the Ocean Springs City Hall.

236.    Relying on Mississippi statutory law, the City did not attempt to inform affected property owners that it had passed the April 4 resolution.

237.    Relying on Mississippi statutory law, the City did not attempt to inform property owners of the significance of the April 4 resolution's passage (*i.e.*, that it placed them in danger of losing important property interests).

238.    Relying on Mississippi statutory law, the City did not attempt to inform property owners that they only had ten days following the April 4 resolution to challenge it, lest they lose their property interests forever.

239.    Plaintiffs, and others across their community, did not learn of the April 4 resolution until months later—long after the 10-day statutory window for challenging it had expired.

240.    Even so, ten days is nowhere near enough time for ordinary property owners to secure an attorney and expert to defend their property interests.

241.    Had Plaintiffs learned of the April 4 resolution and its significance in time to hire an attorney and expert to challenge it, they would have done so.

242.    Had Plaintiffs been afforded adequate notice regarding the April 4 resolution, they would have appeared at the April 4 hearing and objected.

243.    The factual findings underlying the April 4 resolution are so utterly baseless that, even without an attorney or expert, Plaintiffs would likely have been able to explain that their properties and the surrounding areas do not contain substantial slum or blight.

244.    Because Plaintiffs are no longer able to challenge the April 4 resolution (*i.e.*, the urban-renewal-area designation affecting their properties), Plaintiffs' properties are subject to acquisition pursuant to any future urban renewal plan.

245.    But for the urban-renewal-area designation, the City would be unable to acquire Plaintiffs' properties pursuant to any urban renewal plan.

246.    Under Mississippi law, Plaintiffs may no longer challenge the City's underlying findings of blight or slum—even as a defense to a future eminent-domain action taken pursuant to an urban renewal plan that relies on the urban-renewal-area designation.

## CAUSE OF ACTION

### Count I
### 42 U.S.C. § 1983 – Fourteenth Amendment
### (Due Process Claim Against Ocean Springs)

247.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1–246.

248.    The Due Process component to the Fourteenth Amendment to the United States Constitution demands, amongst other things, that persons be afforded notice and a meaningful opportunity to be heard before they may be deprived of a property or liberty interest.

249.    Mississippi statutes, on their face and as applied to Plaintiffs by the City, acting under color of state law, violate Plaintiffs' Fourteenth Amendment due-process rights to individual notice and a meaningful opportunity to be heard before being deprived of their property interests.

250.    As a direct and proximate result of Mississippi statutes, on their face and as applied to Plaintiffs, Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent the permanent deprivation of their property interests.

251.    Unless the April 4 resolution creating the Ocean Springs Urban Renewal Areas is declared invalid, and unless the City is enjoined from proceeding with any urban renewal plan

based on that resolution, Plaintiffs and others like them will continue to suffer great and irreparable harm.

252.    Unless these Mississippi statutes are enjoined to the extent they fail to provide owners with notice and a meaningful opportunity to be heard before being deprived of their property interests, Plaintiffs and others like them will continue to suffer great and irreparable harm.

## REQUEST FOR RELIEF

Therefore, Plaintiffs respectfully request the following relief:

A.    Entry of judgment declaring that the April 4 resolution ("A RESOLUTION DESIGNATING SLUM AND BLIGHTED AREAS FOR REHABILITATION, CONSERVATION, AND REDEVELOPMENT"), which created Ocean Springs Urban Renewal Areas 1–6, was passed without due process of law and is therefore invalid;

B.    Entry of judgment declaring that Miss. Code § 11-51-75 is unconstitutional on its face and as applied to the extent that it fails to provide personal notice to potentially affected owners of proposed resolutions designating their property as an urban renewal area, of proposed findings of fact underlying the urban-renewal-area designation, of the time-sensitive opportunity to appeal the resolution, of the mechanism for appealing the resolution, and of the consequences, including loss of rights, of not appealing the resolution;

C.    Entry of judgment declaring that Miss. Code § 11-51-75 is unconstitutional on its face and as applied to the extent that its failure to provide adequate notice to affected property owners deprives them of a meaningful opportunity to be heard in defense of their interests;

D.    Entry of judgment declaring that Miss. Code § 11-51-75 is unconstitutional on its face and as applied to the extent that it does not allow owners to challenge the statutory predicate of an urban renewal area or plan at the time of a subsequent exercise of eminent domain;

E.    Entry of judgment declaring that Miss. Code § 43-35-13 is unconstitutional on its face and as applied to the extent that it deprives persons of property or liberty interests, without granting them a meaningful opportunity to defend those interests;

F.    Entry of judgment declaring that, by creating Ocean Springs Urban Renewal Areas 1–6 without providing owners notice and a meaningful opportunity to challenge the inclusion of their property in an urban renewal area, the City deprived Plaintiffs and others like them of their property interests, under color of state law, without due process of law;

G.    Entry of a permanent injunction preventing the City from approving any urban renewal plan predicated on the April 4 resolution or Ocean Springs Urban Renewal Areas 1–6, or from creating any future urban renewal area without providing affected property owners notice reasonably designed to allow them a meaningful opportunity to defend their rights;

H.    An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988;

I.    Nominal damages of $1;

J.    Any further legal or equitable relief as the Court may deem just and proper.

Dated: October 12, 2023.                    Respectfully submitted,

                                            /s/ C. Elizabeth Feder-Hosey
Dana Berliner (D.C. Bar No. 447686)*        C. Elizabeth Feder-Hosey
Suranjan Sen (TN Bar No. 038830)*           MS Bar No. 104127
Dylan Moore (ME Bar No. 010327)*            FEDER-HOSEY LAW
INSTITUTE FOR JUSTICE                       P.O. Box 1618
901 N. Glebe Rd., Suite 900                 Ocean Springs, MS 39566
Arlington, VA 22203                         (228) 324-6038
(703) 682-9320                              elizabeth@feder-hoseylaw.com
dberliner@ij.org
rmcnamara@ij.org
ssen@ij.org
dmoore@ij.org

*Pro Hac Vice motions to be filed

*Attorneys for Plaintiffs*